DANIEL W. COX *vs.* CHRISTIAN P. ANDERSEN & another.

Suffolk.    December 7, 1906. — February 26, 1907.

Present: KNOWLTON, C. J., HAMMOND, LORING, BRALEY, & RUGG, JJ.

*Sale.    Words,* "Sample."

Where one agrees to buy a stipulated amount of a kind of coal called "river anthracite" from a dealer who tells him that he buys this kind of coal from men who dredge it from a river and that he sells it as he buys it, and the seller exhibits to the buyer a specimen of river anthracite, saying that it may run a little better or a little worse than the specimen, and on the next day the seller writes to the buyer that he is sending by express a sample of the river anthracite coal, saying "it may run a little better, or a little worse, we take it as we get it and so ship it," and afterwards writes " the sample sent you is about an average, you may judge from it the percentage of sticks, stones, etc. in it," the sale can be found not to be a sale by sample, so that, although the coal delivered is inferior to the specimen exhibited or to that afterwards sent, if it is river anthracite and is merchantable the seller can recover the agreed price; and a statute of another State where the sale was made relating to sales by sample does not apply to the transaction.

Where a buyer has ordered merchandise which is to be shipped to him by rail, and the seller delivers the merchandise on board the cars at the shipping point consigned to the buyer as directed, the title passes and the buyer owes to the seller the price agreed upon.

BILL IN EQUITY, filed in the Superior Court on March 12, 1904, by Daniel W. Cox, of Harrisburg in the State of Pennsylvania, doing business under the name of D. W. Cox and Company, against Christian P. Andersen, doing business in Boston, and the Andersen Coal Mining Company, a corporation organized under the laws of the State of New Jersey and having a usual place of business in Boston, to reach and apply the interest of the defendant Andersen in the defendant corporation to the payment of a debt of $1,654.86 alleged to be due from the defendant Andersen to the plaintiff for coal sold and delivered.

In the Superior Court the case was referred to a master, who filed a report in favor of the plaintiff.    Later the case was heard by *Fox,* J. upon the master's report and the exceptions thereto. He made a final decree overruling all the exceptions to the master's report, confirming the report, declaring that the defendant Andersen owed the plaintiff $1,654.86, with interest thereon at

six per cent per annum from November 2, 1902, to the date of the decree, making the sum of $1,992.45, and ordering that the interest of the defendant Andersen in the defendant corporation be applied toward the payment of that debt. The defendant Andersen appealed.

The master found the following facts:

The controversy in question grew out of the anthracite coal strike of 1902. At that time the plaintiff was a wholesale dealer in anthracite and bituminous coal with a place of business and residing at or near Harrisburg, Pennsylvania. The defendant Andersen was a wholesale coal dealer with an office in Boston. Hereinafter he is called the defendant.

Owing to the stringency in the coal market and the difficulty of obtaining a sufficient supply of anthracite coal, because of the strike, the defendant sent his agent, one Ellicutt, to Pennsylvania to see what coal he could purchase there. Upon learning for the first time that there was a commodity called " river anthracite," the defendant's agent saw the plaintiff at the latter's office during the morning of September 26, 1902, and inquired if he had river anthracite coal to sell. The plaintiff replied that he then was shipping some river anthracite coal to other parties, and could not tell certainly whether he could obtain enough additional coal to supply all the defendant wanted, but thought that he could. The character of river anthracite coal and its component parts were explained to Ellicutt, and the plaintiff stated that he bought the coal from the men on the river who dredged it, and that he sold it as he bought it, and that it might run a little better or a little worse than the coal which the plaintiff had in his office, a specimen of which was shown to Ellicutt. The plaintiff also offered to show Ellicut the process of dredging coal from the river, but the latter declined on account of lack of time. Ellicutt said he would take the coal " as is, I am going to take care of it," and a tentative agreement was reached, provided the plaintiff could obtain the requisite additional amount from the dredger men at the same price he then was paying, by which the plaintiff was to sell to the defendant fifteen hundred tons of river anthracite at $2 a gross ton, four to six cars daily, delivered on the railroad cars at the shipping point near Harrisburg, consigned to C. P. Andersen at South Amboy, which is the point where the coal

shipped by rail reached water transportation. The plaintiff had been dealing in river anthracite for only a few months previous, and this was the first time that the defendant or his agent Ellicutt had purchased river anthracite coal. The defendant's agent then reduced the agreement reached during the morning, as he understood it, into writing in the form of a letter to the plaintiff confirming their conversation, and called on the plaintiff during the afternoon of the same day, when he was informed by the plaintiff that the latter thought he could obtain the coal for the defendant, and that he would begin shipments in a short time, and it was arranged that the plaintiff should ring up the defendant's agent on the following day by telephone at Altoona, Pennsylvania, where the latter was going in search of more coal, and inform him definitely whether the plaintiff could furnish the coal.

On the following day the plaintiff wrote to the defendant in regard to the conversation with the defendant's agent on the day previous, and stated that he was sending by express a sample of the river anthracite coal and said therein " it may run a little better, or a little worse, we take it as we get it and so ship it."

On the same day, or the day following, the plaintiff telephoned to the defendant's agent and stated that he had been unable to buy the coal from the river men at the same rate that they had been furnishing it previously, and that he would be obliged to charge the defendant $2.50 per gross ton, to which change in price the defendant's agent agreed, and urged the plaintiff to push the shipments as fast as possible, and on October 2, 1902, the plaintiff wrote to the defendant stating that he could not get the river coal without paying $.50 a ton more to the dredgers, and that he had so advised Ellicutt, who had directed him to ship at the rate of $2.50, and in this letter the plaintiff said, " the sample sent you is about an average, you may judge from it the percentage of sticks, stones, etc. in it.   We explained very fully to Mr. Ellicutt the character and condition of the coal, in order that there might be no misunderstanding about it, for we said to him, we don't want to ship a lot of coal to South Amboy and have trouble with it because it don't please you.   He said, ' ship it as is, we will take care of it.'   The sticks and shells give the coal a bad appearance, but don't hurt it of any consequence, the stones do."

On October 4, 1902, the defendant wrote to the plaintiff acknowledging the receipt of the letter of the 2d instant, and making no objection to or repudiation of the price of $2.50 a ton, or of the statement of the conversation with the defendant's agent therein referred to.

The master found that the contract was made in Pennsylvania and was governed by the laws of that State, that it was partly an oral one and partly reduced to writing, and that as completed it was that the plaintiff should sell to the defendant fifteen hundred tons of river anthracite coal, f. o. b. cars at point of shipment, for $2.50 a gross ton, the plaintiff to ship from four to six cars daily, if he could obtain sufficient coal therefor from the dredger men, and the defendant to make weekly payments therefor, according to weekly bills and drafts rendered him by the plaintiff. The master found that there was no sale by sample, nor an agreement that the river anthracite coal to be delivered should be equal in quality to the specimen shown Ellicutt, or to that sent to the defendant, which specimens he found were shown for the purpose of conveying to those unfamiliar with the commodity called river anthracite coal a knowledge of its characteristics and component parts.

He found that river anthracite coal was a commodity known in the vicinity of Harrisburg, but little known elsewhere, and that before the coal strike of 1902 it had only a local use in the vicinity of Harrisburg, where it was used in furnaces with movable grates and strong drafts, and sometimes was mixed with bituminous coal. So far as appeared in evidence, no river anthracite had been shipped to New England until during the coal strike. River anthracite is the result of the washing of small particles of coal from the collieries on the Susquehanna River, and the coal is deposited during high water in the shallow places in the river in the vicinity of Harrisburg.

The plaintiff began shipping coal to the defendant on October 1, 1902, and during the first week shipped five hundred and forty-three and twenty-six one hundredths tons, and attached the shipping receipts to a draft on the defendant figured at the rate of $2.50 per gross ton, which draft, amounting to $1,358.15, the defendant paid, although he had not seen any of the coal shipped. No charge was made for this coal in the bill in equity.

Between October 4 and 10, 1902, the plaintiff shipped only three cars, as owing to the heavy rains and consequent high water in the river he was unable to obtain sufficient coal from the dredger men, who were compelled to suspend operations for a time, and the master found that this failure to ship from four to six cars daily during that period was not owing to any bad faith on the part of the plaintiff. Between October 4 and October 14, 1902, the date of the last shipment, the plaintiff shipped on cars consigned to the defendant six hundred and sixty-one tons, all of which the defendant took on vessels at South Amboy except one hundred and forty-eight tons, which still remains there, the defendant failing to remove it. The defendant refused to pay for six hundred and sixty-one tons of coal consigned to him by the plaintiff and placed on the railroad cars at the shipping point, where the master found that the title to all the coal shipped passed to the defendant.

On October 16, 1902, the defendant telegraphed to the plaintiff as follows : "River coal proves unsatisfactory, make no more shipments my account," and on the same date wrote to the plaintiff stating that a cargo of the coal just discharged at Providence contained a very large quantity of stones as big as one's fist. In compliance with the defendant's telegram, the plaintiff ceased shipping any further coal to the defendant, and informed him on October 17, 1902, by letter, that he had shipped the defendant altogether twelve hundred and five tons. Considerable correspondence ensued between the plaintiff and the defendant in regard to the alleged greater number of impurities in the coal than was expected, and the plaintiff drew on the defendant for the balance of $1,654.86, which he claimed as due for the six hundred and sixty-one tons of coal already shipped. This draft was refused by the defendant on November 2, 1902.

The master found that the defendant never notified the plaintiff that he rejected any of the coal shipped. He found that the river anthracite coal as shipped by the plaintiff to the defendant was about uniform in grade and that it contained a considerably larger proportion of sand, stones and pebbles than the specimen, or so called sample, sent by the plaintiff to the defendant, and was considerably inferior to it in quality. He found that the coal shipped by the plaintiff to the defendant

was "river anthracite" and was of a merchantable quality, although inferior in quality to the specimen sent, and that its merchantability at that time was increased by the conditions then existing in the coal market caused by the coal strike of 1902. He found that its inferior quality was not due to any bad faith on the part of the plaintiff, but was due to the beds of the river being too closely worked during periods of low water and to the probable rapacity of the dredger men.

*J. E. Hannigan*, for the defendant Andersen.

*E. F. McClennen*, for the plaintiff, was not called upon.

LORING, J. 1. We are of opinion that on the facts stated in his report the master cannot be held to be wrong in finding as a fact that the sale was not a sale by sample. The specimen shown the defendant's agent Ellicutt, on September 26, was not called a sample by the plaintiff; and, although that sent to the defendant by express on September 27 was spoken of in the plaintiff's letter as a sample, that did not prevent the master from finding that the sale made was a sale of the coal as the plaintiff received it from the dredgers, whether better or worse than the specimens. See in this connection *Weston* v. *Barnicoat*, 175 Mass. 454. For this reason the statute of Pennsylvania enacted April 13, 1887, relative to sales by sample, does not apply.

2. The master found that the coal shipped answered the description of the coal which the defendant agreed to buy and pay for. When the plaintiff delivered this coal at his own expense on board the cars at the shipping point near Harrisburg, consigned to the defendant as directed, he had done all he was required to do to entitle himself to the contract price. The title passed to the defendant, and he owed the plaintiff the price agreed upon. See *Dr. A. P. Sawyer Medicine Co.* v. *Johnson*, 178 Mass. 374.

*Decree affirmed.*